IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

IGUANA, LLC,                        *

     Plaintiff,                    *

vs.                                 *        CASE NO. 7:08-CV-9 (CDL)

PAUL E. LANHAM, et al.,             *

     Defendants.                   *

_____

O R D E R

    This action arises from a letter that Defendant Charles
Calkins ("Calkins"), a partner in the law firm of Defendant
Kilpatrick Stockton, LLP ("Kilpatrick"), wrote to Plaintiff
Iguana, LLC ("Iguana") on behalf of his client, Defendant Paul
Lanham ("Paul Lanham").  The letter accused Iguana of willfully
infringing U.S. Reissue Patent No. 35,571 ("U.S. Re. '571").
Defendant H. David Cobb obtained a copy of the letter and
forwarded it to Iguana's suppliers, including Patriot
Performance Materials ("Patriot").  Iguana contends that it was
harmed as a result of the letter being sent to Patriot, and
Iguana asserts claims against Defendants for defamation,
tortious interference and common law conspiracy. Presently
pending before the Court are the summary judgment motion of
Calkins and Kilpatrick (collectively, "Kilpatrick Defendants")
(ECF No. 175) and the summary judgment motion of Paul Lanham

(ECF No. 177).  Both of these motions seek dismissal of Iguana's claims for tortious interference, defamation and conspiracy. For the reasons set forth below, the motions are granted.

Also before the Court is the summary judgment motion of Defendants H. David Cobb, Federal Marketing Service Corporation and Montgomery Marketing, Inc. (collectively, "MMI Defendants") (ECF No. 169).  After that motion was filed, the Court struck the MMI Defendants' Answers and placed the MMI Defendants in default as to liability.  *Iguana, LLC v. Lanham*, No. 7:08-CV-09 (CDL), 2011 WL 5154062, at *6 (M.D. Ga. Oct. 28, 2011). Therefore, the MMI Defendants' summary judgment motion is denied as to the MMI Defendants' liability on the claims against them. The Court did state that the MMI Defendants "shall be permitted to contest the amount of damages for which they should be held liable."  *Id.*  In their summary judgment motion and in a recently filed motion to strike (ECF No. 244), the MMI Defendants contend that Iguana has not presented sufficient evidence to create a genuine fact dispute regarding damages.  As discussed in more detail below, the Court disagrees, and the MMI Defendants' summary judgment motion as to damages and their motion to strike are denied.

In addition to the summary judgment motions, Iguana has filed two motions to strike testimony of Defendants' experts. First, Iguana seeks to exclude the testimony of Samuel Hewitt,

Defendants' accounting and government contracting expert. Defendants intend to offer Hewitt's opinions on (1) the reasons for the drop in Iguana's Automated Best Value System score, (2) the reasons why Iguana lost a 2008 contract to MMI and (3) the calculation of Iguana's lost profits. The Court has fully considered Iguana's motion to exclude Hewitt's testimony (ECF No. 181) and finds that Hewitt is qualified to render an expert opinion on these issues and that his opinion is sufficiently reliable to satisfy Federal Rule of Evidence 702. Therefore, Iguana's motion to exclude Hewitt's testimony is denied.

Second, Iguana seeks to exclude the testimony of William Needle. Defendants retained Needle, a respected patent attorney, as an expert to opine as to how a reasonable patent attorney would have acted under the circumstances facing Calkins when he drafted and sent the Infringement Letter. Iguana seeks to exclude Needle's testimony, contending that his opinions are not reliable because they are not based on sufficient facts. The Court has fully considered Iguana's motion to exclude Needle's testimony (ECF No. 182) and finds that Needle is qualified to render an expert opinion in this matter and that his opinion is sufficiently reliable to satisfy Federal Rule of Evidence 702. Accordingly, Iguana's motion to exclude Needle's testimony is denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

The record, viewed in the light most favorable to Iguana, establishes the following.  Unless otherwise noted, the facts are undisputed.

**I.   The Patents at Issue in this Action**

U.S. Re. '571 was issued to Eddie McLeese on July 29, 1997. U.S. Re. '571 was based on U.S. Patent No. 4,858,634 ("'634 Patent").  Following the issuance of the '634 Patent, McLeese executed license agreements purporting to license the '634

Patent to various individuals and entities.[1]  Defendants contend that Paul Lanham ultimately obtained an exclusive license in the '634 Patent and U.S. Re. '571.  Iguana disputes that Paul Lanham was the exclusive licensee of the patents for two reasons.  First, Iguana contends, based on the July 2011 deposition testimony of McLeese, that the license was not transferred to a company called Natural Born Carvers.  It is undisputed that the chain of title for the rights to the patents at issue in this case depends in part on the Natural Born Carvers license.  The Court previously concluded that there is a genuine fact dispute as to whether McLeese entered into the license agreement with Natural Born Carvers.  *Iguana, LLC v. Lanham*, No. 7:08-CV-09 (CDL), 2011 WL 6028404, at *1 (M.D. Ga. Dec. 5, 2011).  Second, Iguana argues, based on the April 2010 deposition testimony of Paul Lanham, that Paul Lanham did not sign certain agreements relating to the patents at issue in this case, including the 1999 Worldwide Exclusive License Agreement.  The Court previously concluded that there is a genuine fact dispute as to whether Randall Lanham signed the documents on Paul Lanham's behalf and had the authority to do so.  *Id.* at *2.

---

[1] For a detailed summary of the license agreements, see *Iguana, LLC v. Lanham*, No. 7:08-CV-09 (CDL), 2010 WL 3394899 (M.D. Ga. Aug. 23, 2010).

## II.  The Infringement Letter

Calkins is a member of the District of Columbia Bar, the North Carolina Bar and the Massachusetts Bar.   He is a registered patent attorney who practices law in North Carolina. Calkins represents Paul Lanham.   Randall Lanham, Paul Lanham's son, is a California attorney who has acted as Paul Lanham's personal attorney.   Most of Calkins's communications to Paul Lanham regarding U.S. Re. '571 were through Randall Lanham. Scott Bowen ("Bowen"), who lives in North Carolina, assisted Paul Lanham in his efforts to license U.S. Re. '571, and he shared in the royalty stream from licensing rights in the patent. Montgomery Marketing, Inc. ("MMI"), an Alabama company, sublicensed the rights to U.S. Re. '571 for military sales of bednets.   David Cobb ("Cobb") is MMI's president and chief executive officer.

According to Defendants, Paul Lanham and his business associate Bowen believed that Iguana was infringing U.S. Re. '571 by making a product called a bednet and selling it to the U.S. military.   They were also concerned that Iguana was offering it for sale commercially on its website.   Bowen Dep. 193:10-20, ECF 229-2.   Iguana maintains that Paul Lanham and Calkins, along with Randall Lanham and others, conspired with Cobb to harm Iguana's relationships with its suppliers, causing harm to Iguana's business and benefitting MMI's business.   As

discussed in more detail below, Iguana has not pointed to any evidence that Calkins and/or Paul Lanham were involved in any such conspiracy.

In November 2007, Bowen contacted Calkins about sending an infringement letter ("Infringement Letter") to Iguana's supplier, Patriot. Kilpatrick Defs.' Mot. for Summ. J. Attach. 10, Email from S. Bowen to C. Calkins (Nov. 23, 2007), ECF No. 175-10. In the email, Bowen stated that MMI had requested the letter to "deter [Patriot] from supplying Iguana."[2] *Id.* Calkins advised Bowen and Randall Lanham that it would not be appropriate to send a cease and desist letter to Iguana based on the military sales but that such a letter could be sent regarding Iguana's commercial sales. Bowen Dep. 193:5-20. Calkins explicitly advised against sending an infringement letter to Iguana's suppliers and told Bowen and Randall Lanham that such a letter could constitute tortious interference with Iguana's business relationships. *Id.* at 191:9-193:4.

After he was retained by Bowen and Paul Lanham, Calkins obtained a copy of the 1999 Worldwide Exclusive License Agreement and reviewed it. Kilpatrick Defs.' Statement of

---

[2] *See also, e.g.,* Pl.'s Traverse to Kilpatrick Defs.' Statement of Material Facts Ex. 5, Email chain between R. Lanham & D. Cobb (Nov. 17, 2007), ECF No. 188-6 (Cobb stating that if Randall Lanham sent Patriot an infringement letter "they will drop [the Iguana contract] like a hot rock"); Pl.'s Traverse to Kilpatrick Defs.' Statement of Material Facts Ex. 9, Email from D. Cobb to S. Bowen (Nov. 20, 2007), ECF No. 188-10 (Cobb asking Bowen how he was coming "with the letter to Patriot").

Undisputed Material Facts Attach. 6, Calkins Decl. ¶ 7, ECF No. 175-6.  Calkins also reviewed the past licenses relating to the patents at issue in this case, and he had Randall Lanham explain the transactions to him.  *Id.* ¶ 10.  Calkins also reviewed the prosecution histories for the '634 Patent and U.S. Re. '571 and the acquisition and contract data relating to bednets.  *Id.* ¶ 8.  He also reviewed bibliographic data from the U.S. Patent and Trademark Office regarding U.S. Re. '571, which showed that the patent was in good standing and that maintenance fees had been paid.[3]  *Id.* ¶ 8.  In addition, Calkins analyzed a bednet sample that had been manufactured by MMI but which Bowen represented was structurally the same as the bednets Iguana was selling to the U.S. military.  *Id.* ¶ 9.

Calkins drafted the Infringement Letter, which asserted that Paul Lanham had the right to enforce U.S. Re. '571, Iguana's "bednet" product infringed U.S. Re. '571 and that the infringement was willful.  Kilpatrick Defs.' Mot. for Summ. J. Attach. 5, Letter from C. Calkins to E. Stewart (Dec. 17, 2007), ECF No. 175-5 [hereinafter Infringement Letter].  As discussed above, Calkins had explicitly advised Bowen, Paul Lanham and Randall Lanham against sending an infringement letter to

---

[3] The Court previously concluded that a genuine fact dispute exists on the issue of whether U.S. Re. '571 is unenforceable because McLeese and his counsel allegedly misled the Patent and Trademark Office intentionally by paying "small entity" fees instead of "large entity" fees.  *Iguana, LLC v. Lanham*, No. 7:08-CV-09 (CDL), 2011 WL 6028404, at *2 (M.D. Ga. Dec. 5, 2011).

Iguana's suppliers because such a letter could constitute tortious interference with Iguana's business relationships. Bowen Dep. 191:9-193:4. Iguana nonetheless contends that Calkins determined that "the letter could be supplied to Cobb who would surreptitiously provide it to the suppliers." Pl.'s Statement of Material Facts ¶ 48, ECF No. 191. In support of this contention, Iguana cites two portions of Bowen's deposition. First, he cites the following exchange:

> Q: So was Charles [Calkins] refusing to write any letter?
>
> A: No. We go on. The next note I make is maybe as simple as looking up at the product on the web on Iguana's website.

Bowen Dep. 193:5-9. Read in the context of the surrounding testimony, Bowen's testimony suggests that Calkins said that mailing the letter to the suppliers could constitute tortious interference and should therefore not be done but that a cease and desist letter could be sent to Iguana if there was some evidence of commercial sales. *Id.* at 191:24-193:20. Iguana also cites another portion of Bowen's deposition where Bowen testified that he assumed the Infringement Letter would be provided to MMI and that MMI would send it to Patriot. *Id.* at 213:21-215:8. Iguana also argues that Calkins determined that "the letter could be supplied to Cobb who would surreptitiously provide it to the suppliers." Pl.'s Statement of Material Facts

¶ 48, ECF No. 191.   There is, however, no evidence that Calkins made any such determination.   There is also no evidence that either Calkins or Paul Lanham intended to provide the Infringement Letter to MMI or that they knew it would be provided to MMI.   *See* Bowen Dep. 267:16-24 (stating that Bowen never told Calkins that MMI might send the Infringement Letter to Iguana's suppliers).

Calkins sent the Infringement Letter to Iguana on behalf of Bowen and Paul Lanham.   Kilpatrick Defs.' Statement of Undisputed Material Facts Attach. 6, Calkins Decl. ¶¶ 20-22, ECF No. 175-6.   It is undisputed that Calkins also forwarded copies of the Infringement Letter to Bowen and to Paul Lanham through Randall Lanham.   Iguana contends that "Bowen and Calkins engaged in communications relating that Calkins was to supply a '.pdf' version of the Infringement Letter to Bowen and [Randall] Lanham who would then supply it to . . . MMI."   Pl.'s Statement of Material Facts ¶ 50, ECF No. 191.   In support of this contention, Iguana cites an email from Calkins to Bowen and Randall Lanham that states:

> Scott/Randall
> Attached please find a copy of our letter to Iguana from this past December. My assistant is out today and we [are] in the process of relocating our file room. Thus, I could not locate the signed version to PDF. I will forward it tomorrow morning.   To date, we have not received a reply.
> Charles

Pl.'s Statement of Material Facts Ex. 21, Email from C. Calkins to S. Bowen (Jan. 7, 2008), ECF No. 191-22.  Nowhere in this communication does Calkins state that he is supplying the letter to his clients so that they may forward the letter to MMI. Again, as discussed above, Calkins expressly advised Bowen and Randall Lanham that it would *not* be appropriate to forward the letter.

It is undisputed that after Bowen received a copy of the Infringement Letter from Calkins, he forwarded it to two individuals.[4]  It is also undisputed that Randall Lanham forwarded the Infringement Letter to Cobb and that Cobb sent a copy of the Infringement Letter to Patriot and to other suppliers.  There is evidence that when Patriot received the Infringement Letter, it halted production and laid off some workers.  Powell Dep. 165:9-14, 169:25-170:11.  ECF No. 218-1.

## III. The Conspiracy Allegations

Iguana asserts that there was a conspiracy between Bowen, Calkins, Cobb, Paul Lanham, Randall Lanham and George Smith ("Smith") of MMI to damage Iguana's Automated Best Value System ("ABVS") score, which would harm Iguana's business.  In support of this assertion, Iguana points to a number of emails between Cobb, Smith and others regarding a "Berry Amendment" fight

---

[4] There is no evidence that either of these individuals—George Smith and Barry Burge—forwarded the letter to Patriot.

concerning a 2005 military bednet contract awarded to Iguana, emails to Iguana's suppliers and potential suppliers discouraging them from selling to Iguana, and emails from Cobb to various third parties attaching the Infringement Letter. Pl.'s Statement of Material Facts Ex. 15, ECF No. 191-16.  The emails do show that Cobb wanted to gain a competitive advantage over Iguana by interfering with Iguana's suppliers, and they show that Smith and Randall Lanham were aware of Cobb's plans and goals.  Notably, however, neither Calkins nor Paul Lanham was copied on any of these emails, and the emails do not support the assertion that Calkins and Paul Lanham were engaged in any conspiracy.

Iguana also contends that Bowen, Calkins, Cobb, Paul Lanham, Randall Lanham and Smith determined that an infringement letter to Patriot—Iguana's "cut and sew" supplier for bednets—would cause Patriot to stop production and therefore cause Iguana to delay shipping its products, thus damaging its ABVS score and its business.  In support of this contention, Iguana cites a number of emails, some of which reference "patent lawyers contacting Patriot about Iguana."  Pl.'s Statement of Material Facts Ex. 19 at MMI-DISC000509, ECF No. 191-19 at 5 (email between Cobb and Jeff Moody asking the status of patent lawyers "contacting Patriot about Iguana"); *id*. at MMI-DISC000538, ECF No. 191-19 at 8 (email between Cobb, Bowen,

Smith and Randall Lanham suggesting that infringement letter
should come from Charles Calkins); *id.* at MMI-DISC000702, ECF
No. 191-19 at 15 (same); *id.* at MMI-DISC000839, ECF No. 191-19
at 21 (email between Cobb and Smith discussing plans to "stomp
the lizard" and forward the Infringement Letter to Iguana's
suppliers); *id.* at MMI-DISC000859, ECF No. 191-19 at 25 (email
from Cobb to "Steve" requesting that Steve forward the
Infringement Letter to Patriot but remove Cobb's information).
Again, while the emails support the assertion that Bowen, Cobb,
Randall Lanham and Smith were engaged in a conspiracy to send an
Infringement Letter to Iguana's suppliers, neither Calkins nor
Paul Lanham was copied on any of these emails, and the emails do
not support the assertion that Calkins and Paul Lanham were
engaged in any conspiracy.[5]

DISCUSSION

## I.   Claims Against Paul Lanham and the Kilpatrick Defendants

Paul Lanham and the Kilpatrick Defendants contend that they
are entitled to summary judgment because: (1) Paul Lanham and
Calkins were privileged to send the Infringement Letter and (2)
neither Paul Lanham nor Charles Calkins "published" the letter,

---

[5] As further evidence of the alleged conspiracy, Iguana pointed to
evidence that Calkins said he was going to contact a supplier called
Buzz Off. Bowen Dep. 198:20-199:6. Calkins did not say he would
contact Buzz Off regarding Iguana, however; he said he would contact
Buzz Off regarding MMI. *Id.* Thus, the evidence regarding Buzz Off
does not show that Calkins was part of a conspiracy to notify Iguana's
suppliers of the alleged infringement.

and their actions did not cause Iguana damages. The Court addresses each issue in turn.

### A. Was the Infringement Letter Privileged?

Federal patent law "preempts state-law tort liability when a patentee in good faith communicates allegations of infringement of its patent." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 & n.5 (Fed. Cir. 2008). This preemption also applies when an exclusive licensee of a patent in good faith attempts to enforce its patent rights. *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1343 (Fed. Cir. 1999). Therefore, if Paul Lanham is the exclusive licensee of U.S. Re. '571 and Calkins in good faith communicated allegations of infringement of that patent, then Iguana's claims against Calkins and Paul Lanham are preempted.

This preemption does not apply if the patent holder acted in bad faith in the enforcement of its patent. *E.g., 800 Adept, Inc. v. Murex Sec., LTD.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008). "This 'bad faith' standard has objective and subjective components." *Id.* at 1370. "The objective component requires a showing that the infringement allegations are 'objectively baseless.'" *Id.* "The subjective component relates to a showing that the patentee in enforcing the patent demonstrated subjective bad faith." *Id.* It is not necessary to reach the subjective component unless there is showing that the

14

infringement allegations are objectively baseless. *Id.*
"Infringement allegations are objectively baseless if 'no
reasonable litigant could realistically expect success on the
merits.'" *Id.* (quoting *Prof'l Real Estate Investors, Inc. v.
Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 (1993)).

The Court finds that Iguana has not presented sufficient
evidence to create a genuine fact dispute on whether the
infringement allegations in this case were objectively baseless.
First, there is no evidence that it was objectively baseless for
Calkins to conclude that Paul Lanham had the right to enforce
U.S. Re. '571. Calkins reviewed the license agreements
regarding the applicable patents, and he discussed them with
Paul Lanham's personal attorney. Even though deposition
testimony taken years after Calkins sent the Infringement Letter
creates a genuine fact dispute as to whether the chain of title
reflected in the records Calkins reviewed was correct, Calkins
was not unreasonable in relying on those documents and on his
interview of Randall Lanham. Based on that information, Calkins
was not unreasonable in concluding that Paul Lanham was the
exclusive licensee of U.S. Re. '571. Second, it was not
objectively baseless for Calkins to conclude that the correct
maintenance fees had been paid on the patents. There is no
evidence that he knew of any license that was in effect and
would have required large entity fees, and there is no evidence

that he knew of any intentional misrepresentation on the part of McLeese or the attorneys who prosecuted the patents.   Third, it was not objectively baseless for Calkins to conclude that U.S. Re. '571 could be construed to claim a self-erecting tent structure made with one rod rather than two.[6]   Furthermore, it was not objectively baseless for Calkins to conclude, based on his analysis of a bednet he believed to be structurally the same as Iguana's bednet, that Iguana's bednet infringed U.S. '571. Finally, it was not objectively baseless for Calkins to conclude that the infringement was willful.[7]

For all of these reasons, the Court concludes that the infringement allegations in the Infringement Letter were not objectively baseless.   Therefore, the Court need not determine whether Calkins or Paul Lanham demonstrated subjective bad faith.   Because Calkins and Paul Lanham did not act in bad faith in the enforcement of U.S. Re. '571, Iguana's state law tort claims against them are preempted, and Calkins and Paul Lanham are entitled to summary judgment on these claims.

---

[6] The Court is not suggesting that it will construe the claims of U.S. Re. '571 as covering a structure comprised of loops made out of one piece of wire.   The Court merely finds that it was not objectively baseless for Calkins to make such a conclusion.

[7] Given that it was not objectively baseless for Calkins to conclude that the infringement was willful, the Court rejects Iguana's argument that the content of the Infringement Letter demonstrates as a matter of law that it was intended only for Iguana's suppliers, not Iguana, so there "must have been" some ulterior motive.

B.    Did the Actions of Calkins and Paul Lanham Cause Harm?

Even if Calkins and Paul Lanham were not privileged to send the Infringement Letter, they are still entitled to summary judgment because there is insufficient evidence that they "published" the letter, that they acted with malice or that their actions caused Iguana harm.  To prevail on its defamation claim, Iguana must prove that Defendants "published" the Infringement Letter.  This means that Iguana must prove that there was an "unprivileged communication [of the Infringement Letter] to a third party." *Chaney v. Harrison & Lynam, LLC*, 308 Ga. App. 808, 811, 708 S.E.2d 672, 676 (2011).  Iguana must also prove that it suffered "actual injury from the statement."[8] *Gettner v. Fitzgerald*, 297 Ga. App. 258, 260, 677 S.E.2d 149, 153 (2009).  To prevail on its tortious interference claim, Iguana must establish that Defendants took "improper action or wrongful conduct . . . without privilege [and] . . . acted purposely and with malice with the intent to injure" and that the tortious conduct "induced a breach of contractual obligations" and "proximately caused damage" to Iguana.  *Gordon Document Prods., Inc. v. Serv. Techs., Inc.*, 308 Ga. App. 445, 449, 708 S.E.2d 48, 54 (2011).

---

[8] Iguana must also prove that the Infringement Letter contained a false defamatory statement and that Defendants were at least negligent in making the publication. *Chaney*, 308 Ga. App. at 811, 708 S.E.2d at 676.

As discussed above, the evidence establishes that Calkins sent the Infringement Letter only to two clients: (1) Bowen, who was Paul Lanham's business associate, and (2) Paul Lanham via his attorney Randall Lanham.  Without some evidence that Calkins sent the letter to someone other than his client or reasonably should have known that the letter would be used for some illegitimate purpose, no basis exists for holding Calkins legally responsible simply because his letter was later used—against his advice—for an illegitimate purpose.

Iguana incredibly suggests that it was unreasonable for Calkins to send his own client a copy of a letter that he had written on behalf of that client.  Iguana speculates that Calkins provided the letter to MMI through Randall Lanham and that he knew that the purpose of the letter was to frighten Iguana's suppliers.  The record, however, does not establish a genuine fact dispute on this issue.  The mere fact that Calkins sent the letter to his clients does not create an adverse inference.  There is simply no evidence that Calkins participated in sending the letter to Iguana's suppliers.  To the contrary, the evidence shows that Calkins advised his clients *not* to send the letter to Iguana's suppliers because such an action could constitute tortious interference. Nonetheless, Iguana asks the Court to find—without any supporting evidence—that a reasonable jury could conclude that

Calkins surreptitiously sent the letter to his client, knowing that it would be forwarded to Iguana's suppliers, and fraudulently gave his client legal advice, which at the time he knew would not be followed, for the sole purpose of creating an alibi should his conduct ever be questioned.  While Calkins did know that Bowen and Randall Lanham were initially interested in sending the letter to Iguana's suppliers, he also knew that he had advised them that such a course would be inappropriate and could result in a tortious interference claim.  Inferring from these circumstances that Calkins conspired to send the letter to Iguana's suppliers requires a speculative leap that the law does not permit.  Without some evidence that Calkins intended for the Infringement Letter to be sent to Iguana's competitors, the Court cannot find that his actions—which consisted of drafting the letter and sending a copy to his clients—constitute "publication" of the letter or that his actions demonstrate malice sufficient to impose liability upon him.  The Court also finds no evidence that Calkins's actions proximately caused any harm to Iguana.  While the *receipt* of the letter by Iguana's supplier may have caused harm to Iguana, the *sending* of the letter by Calkins to his client with instructions that it should not be forwarded is too remotely connected to the ultimate harm to be a legal cause of it.  For all of these reasons, the

Kilpatrick Defendants are entitled to summary judgment on Iguana's state law tort claims.

Likewise, Paul Lanham is entitled to summary judgment. There is no evidence that Paul Lanham himself received the Infringement Letter, and there is no evidence that Paul Lanham himself sent the Infringement Letter to anyone. Rather, the evidence shows that his attorney, Randall Lanham, sent the letter to Cobb, who forwarded it to Iguana's suppliers. There is no evidence that Paul Lanham expressly directed or authorized Randall Lanham to send the Infringement Letter to MMI or to any of Iguana's suppliers. *See, e.g., First United Chuch, Inc. v. Udofia*, 223 Ga. App. 849, 852, 479 S.E.2d 146, 150 (1996) (noting that respondeat superior does not apply to utterences of agents acting within scope of employment unless it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff). There is also no evidence that Paul Lanham acted with malice. Furthermore, even if there were evidence that Paul Lanham authorized sending the letter to MMI (which there is not), there is still no evidence that Paul Lanham authorized or directed that the Infringement Letter be sent to Patriot. For all of these reasons, the Court cannot find that Paul Lanham's actions constitute "publication" of the Infringement Letter, that he acted with malice or that his

actions caused Iguana harm.  He is therefore entitled to summary judgment on Iguana's state law tort claims.

## II.  Claims Against MMI Defendants

As discussed above, the MMI Defendants have been placed in default as to the defamation and tortious interference claims against them.  They shall only be permitted to contest the amount of damages caused by the Infringement Letter being sent to Iguana's suppliers.  Iguana seeks the following elements of damage: (1) penalties incurred due to Patriot's production delays following Patriot's receipt of the Infringement Letter, (2) profits lost as a result of a 2008 contract for bednets being awarded to MMI instead of Iguana, (3) damages to reputation and (4) punitive damages.

The MMI Defendants contend that Iguana is not entitled to reputation damages or punitive damages on its defamation claim because Iguana never sought a retraction of the Infringement Letter under O.C.G.A. § 51-5-11.[9]  Iguana responds that the defamation occurred in North Carolina, and therefore, North Carolina law, which has no retraction requirement similar to Georgia's, applies.  Pretermitting whether Georgia or North Carolina law applies, the Court finds that the MMI Defendants

---

[9] The retraction statute does not apply to Iguana's tortious interference claim, and Iguana's failure to request a retraction does not bar punitive damages on the tortious interference claim. *E.g.*, *U.S. Micro Corp. v. Atlantix Global Sys., LLC*, 278 Ga. App. 599, 604-05, 630 S.E.2d 416, 421 (2006).

have waived their right to rely upon any requirement that is a condition precedent for the imposition of liability against them.  While the Georgia retraction statute, if it applied, could provide a defense to Iguana's *entitlement* to reputation damages and punitive damages if the MMI Defendants were not in default, the Court has found that due to the MMI Defendants' sanctionable conduct, they are in default and can only contest the *amount* of damages.  To allow the MMI Defendants to avoid *any amount* of damages for the defamation claim upon which they have defaulted would eviscerate the substance of the sanction.  The Court therefore finds that the MMI Defendants have waived any right to rely upon the Georgia retraction requirement if it were otherwise found to apply.  Accordingly, the Court denies the MMI Defendants' summary judgment motion and motion to strike as to the reputation damages and punitive damages on Iguana's defamation claim.

The MMI Defendants also contend that Iguana's special damages claims are barred because Iguana did not make adequate disclosures during discovery regarding the penalties or the lost profits.  Iguana has until the pretrial conference on January 5, 2012 to establish that it made the required disclosures during discovery.  At trial, Iguana will not be permitted to rely on any evidence that it did not adequately disclose during the discovery period.

CONCLUSION

For the reasons set forth above, the Kilpatrick Defendants' summary judgment motion (ECF No. 175) is granted, as is Paul Lanham's summary judgment motion (ECF No. 177).  The MMI Defendants' summary judgment motion (ECF No. 169) and motion to strike (ECF No. 244) are denied.  Iguana's motion to exclude the testimony of Samuel Hewitt (ECF No. 181) is denied, as is Iguana's motion to exclude the testimony of William Needle (ECF No. 182).

IT IS SO ORDERED, this 15th day of December, 2011.

S/Clay D. Land
_____
         CLAY D. LAND
UNITED STATES DISTRICT JUDGE